Our second case is BillJCo v. Apple, 2023-2348. I think we're all set, Mr. Kuo. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. BillJCo raises a number of issues in this appeal related to the finding of unpatentability to challenge claims with respect to 804 patent. And many of them are issues of law. Some are issues of whether there was substantial evidence. I'd like to focus on just a few of them. And then, obviously, if you have questions, I'll be happy to answer. One of them relates to the claim limitation of transmitting. And this is the transmitting by the sending data processing system, the broadcast unidirectional wireless data record, for receipt by plurality of receiving mobile data processing systems. Obviously, we have disagreed with the Board's disagreement with our claim construction that the transmitting must be directly from one mobile unit to another mobile unit. With respect to the claim construction part of it, we'll just rely on our briefs on that point, unless you have some further questions related to it. However, the reason I'm doing that is because the Board, as an alternative argument, said that even under BillJCo's proposed construction, they found that Himmelstein's PICO net, in particular the concept of a master transmitting data directly to a slave, that that met the transmitting directly limitation. In particular, that's in the final written decision at page 12, which is also Appendix 12. The problem with that conclusion, in our estimation, is that there's no actual evidence about transmitting from a master to a slave. Procedurally, what happened is... Counselor, the record, the intrinsic record, does not preclude the use of an intermediary system in this process. Is that right? I'm sorry? Does it preclude an intermediary? Oh, I would disagree with that. I know you would. Yes, under our proposed claim construction, an intermediary is precluded under the meaning of the claim terms. In the intrinsic record? In the intrinsic record. Show me where. Well, first of all, within the claim itself, which states that the transmitting by the sending data processing system of a broadcast unidirectional system is to be received by the mobile data processing system. So what the claim actually says is, I send it, it gets received by the mobile data processing system. If you refer to the patent itself... And you think that that implies no intermediate hop? In the context of the specification, yes I do. In the context of the specification and the drawings, the patent talks about... The entire purpose of the patent is this location-based exchange of information where it talks about peer-to-peer communication. There is a figure, it looks like a pentagon, and it shows the different mobile devices, and it shows the different communication paths that are possible. And in each of them, it's described also in the specification of the number of nodes that are allowed to transmit. So if you have five, one can transmit to one directly, two directly, three directly, four directly, and then each one of them can do the same thing. There's no discussion in the specification where the transmission goes from one to another and then to a third, as being that transmission to the third receiving unit. And like I said, the overall thrust of the patent is this peer-to-peer communication where you take out a centralized server. What's discussed is that the centralized server creates problems with bottlenecks, it causes security concerns and the like. So rather than do that, we push out the functionality to the mobile units to allow them to communicate directly. But back to my earlier point. The fact that the board relied on Himmelstein's master-to-slave embodiment, purported embodiment, there's a number of problems with that. Is that the same as or different from the reference to the PicoNet? It is the same, yes. There is a reference in Himmelstein to a PicoNet. All it says is that you can use a PicoNet and that the mobile devices can communicate. But isn't that enough? No, it is not. Why? So what we submitted was evidence from our expert that said in a PicoNet, you have a master which acts as basically a hub for communications. And so if mobile unit one wants to talk to mobile unit two, it sends data to the master who then assigns a time to send it and will send it. So it is not unidirectional. You have a stop along the way. What Apple did in response to that expert's opinion was to say, no, no, you've discounted the possibility that the master could be the sending unit. The problem with that is that there's no evidence in the record from any expert, from any of the prior art, from Himmelstein, of that situation where the master communicates directly to the mobile unit. And so this absence of evidence certainly doesn't mean substantial evidence. And the only thing that the board relied on for that was the argument from counsel, from Apple in their briefing. And as everyone knows, attorney arguments have evidence. Did Apple's expert also say it? No, he did not. He did not. Interestingly, in the red brief at speech 33 of the red brief, in the footnote, and this is, of course, Apple's brief, they state, Himmelstein does not refer to master and slave devices. Well, that in and of itself is an admission that it's not in the reference upon which they rely. And, of course, they did not submit any declaration by any expert to support this master and slave embodiment, purported embodiment, and thus there is no substantial evidence to support the basis upon which the board found this limitation to be met. You were going to show me where in the record are intermediaries precluded. Sure. Referring to the patent itself, if you turn to the background of the invention, and I will, admittedly this patent is quite long, if you turn to the, this is APPX, basically starting at APPX 1917. Give us the page. Oh, I'm sorry. It is page 77 of exhibit. I'm sorry. I have the APPX page 1917. Is that the page you were asking for? I'm sorry. The patent. Oh, I'm sorry. Himmelstein or whatever. I'm sorry. It's the. It's the 804 patent. Yeah, it's the 804 patent. My apologies. Appendix 79. Yeah, that's my fault. That's page 11B. Yeah. So if we look at the brief summary of the invention and the background of the invention, and this is an APPX 108, 109, and the following pages. It talks generally about how location-based services were the norm, and those services relied on a central server to kind of direct and consolidate all the transmittal of information from mobile devices. And then in the brief summary of the invention, it talks about, and this is on APPX 109, it talks about the disadvantages of such a system, and then, and I'm referring to column 4, line 24 approximately.  Column 4, line 24.  And you say, you claim that that teaches that intermediaries are precluded? It teaches not to use a centralized server, which would be the intermediary. That's not what I asked, sir. I asked you, is there any place in the record that demonstrates that intermediaries are precluded? What it demonstrates is that intermediaries are not included in the definition. So they may be included, but they're not precluded. No, an intermediary cannot be included within the scope of the claim. Because under the claim words themselves, it says it's a unidirectional transmission. So not all transmissions have to be peer-to-peer. That's correct. That's correct. But in the patent, they do. In the patent, they do have to be peer-to-peer. Counsel, do you want to save five minutes? You can continue or save what you want. The other point I wanted to raise, because I guess I'm limited on my rebuttal to what they talk about. So the other thing I want to talk about very quickly, unless you have some other questions pertaining to this, is the secondary considerations that were at issue before the board and that weren't given any weight. In particular, the copying and the licenses. In what the board, there's no dispute that Apple was sent a portfolio for consideration to be purchased or licensed or whatever it might be. And this is based on an existing relationship that Bill Johnson, the inventor of the patent, had with Apple. They had previously sold to Apple a portfolio patent. So with this new portfolio, he reached out to see if they were interested. What the board then cited was Liquid v. L'Oreal 941F1133. And said that under Liquid, we needed to show that there was proof of a change in their approach to their technology. And while Liquid does give that as an example of copying, L'Oreal is not limited to that kind of situation. In fact, in the Liquid case, they cite Institute Pasteur at 738F1337, in particular page 1347, where the access and the proven similarities between the patented invention and the accused product can demonstrate copying. And what we submitted was a claim chart by our expert, which showed the matching of the claims to the accused product, which was unrebutted by their expert. So the only evidence that you have with respect to that particular question is our unrebutted evidence that it is covered. Secondly, there are numerous licenses. And I understand there's lots of people in the courtroom. I'm not going to go into any confidential information. But there are multiple licenses with some very large companies. And what the board argued was the licenses include many, many patents, and therefore you can't identify which one it's connected to. Over 30. Correct. But you have to keep in mind that how we got to that license was there was a litigation involving what became the eventual licensee, which only involved three patents, and one of those three patents was the 804 patent. So it is very easy to draw that connection between what was the actual impetus for the license. And I'll reserve my minute 30 left, I guess. We'll save it for you.  Good morning, Your Honors. May it please the Court. Each of Bill Jaco's arguments that they've raised here today fails for multiple independent reasons. With respect to claim construction, Your Honor is correct. There is no support in the record that would preclude the use of intermediaries that would support Bill Jaco's construction. In fact, in that very column, they were signing into column four of the 804 patent. This is Appendix 109. And specifically, line 55, extending onto column five, line 10, it talks about indirectly located mobile data processing systems. Later on in the specification, it then goes on to describe those indirectly located mobile data processing systems. This is at Appendix 136, column 57, lines 25 to 37. And there, it's expressly reciting and describing the concept of a peer-to-peer network where there is communication, this is a quote, through a plurality of MSs, i.e. a plurality of HOPs. So directly addressing and discussing communications through intermediaries, both in the summary of the invention as well as in the detailed description. And the Board correctly rejected... So what's the effect of that outcome you're talking about on the decision on motivation to combine? What does that do to Heimlstein, for example? I think with respect to motivation to combine, that the Board's determination is completely supported for two different reasons, both that the Muir reference teaches periodic beaconing, and the Board found, based off of Muir's teachings, that that would save power, as well as Dr. Long's testimony supporting that, that there would have been a motivation. Also that this was a known technique being applied to a known device yielding a predictable result, both independent bases to affirm that. But with respect to the transmitting limitation as well, Your Honor, because the Board's construction was correct, there's no dispute that the transmitting limitation is met under the Board's construction. So this Court doesn't even need to reach that. However, substantial evidence does also support the Board's findings that that limitation is met also under Bill J. Coe's construction. With respect to that PICO-Net disclosure, it expressly teaches, and this is at Appendix 1773, column 7, lines 48 to 52, that mobile units can talk directly to other mobile units. That direct language that they want to read into the claims is expressly taught in the Himmelstein reference, providing substantial evidence supporting that finding. Unless there's any further questions on the transmitting construction or the substantial evidence supporting those findings, we'll turn to the issue of secondary considerations. With respect to secondary considerations, the Board properly found that Bill J. Coe not only failed to show nexus, but also failed to show any actual evidence of non-obviousness. As two of their arguments were raised today, copying and licensing. What's your response to, even though there were 30 patents that were mentioned, that three of them, they were able to establish a nexus for three of the patents? The three of the licenses? You're right. There's 30 patents, they failed to show a nexus to any one of them, let alone that any of those licenses was taken because it valued any of the individual patents, as opposed to wanting to avoid litigation. As the Board correctly pointed out, there was simply no nexus shown back to the 804 patent. What I understood Mr. Coe to say was that there were 30 patents covered by the license, but the license followed litigation on just three of them, of which this is one. So we can put aside the number 30 and focus just on three. And now we're talking about getting close to a connection. Your Honor, I don't believe there's... I believe it runs into the second of those two problems. If those three patents were being litigated, this is more of a sign that the parties are trying to avoid litigation than it is to place any particular value on the 804 patent. But as I think you know, the subject of the role of litigation in arriving at a license doesn't have a particularly clear-cut resolution because the only thing a patent is is a right to go to court to exclude. So the fact that somebody has gone down the path of actually saying, I'm serious about this, I'm going to try to exclude you, doesn't seem to distinguish the world of settlements of litigation from pre-litigation settlements in a terribly strong way. What else do you have? Your Honor, in addition to this, I think they also need to still show a nexus back to... These are ultimately commercial success arguments. They still need to show that there was some sort of commercial success, as well as some nexus back to the patent. They raised the argument that they showed that the iBeacon functionality of Apple infringed. Here, they included a claim chart. This is at Appendix 4480 to 4482. There were 15 limitations in the claim. They charted two of them. They didn't even chart a full claim, let alone provide evidence or analysis explaining how even those two limitations were met. They largely just included screenshots. With respect to copying, Your Honor, I think that same analysis applies. They don't show a nexus back to... We didn't get into it. Mr. Kuo didn't get very far into copying, but I think he said that his client communicated to, if not with, Apple. Is there evidence of Apple's reading the communication and responding or not? Your Honor, I think there was some prior correspondence back and forth. There is no evidence of Apple doing anything with... I think what was identified in those communications was the grandparent application, not even the application that is treated as the 804 patent itself. There's no evidence, such as what would be required under Wires v. Master Lock or Liquid v. L'Oreal, of Apple doing anything with that. No evidence of change in product or even consideration of this application, which was the grandparent, in designing iBeacon or making any changes to iBeacon, Your Honor. I think the board's findings there are both that there was a lack of nexus as well as no evidence of any indicia of non-obviousness or supported by substantial evidence incorrect under this court's precedent. Unless there's any further questions, we would ask that the board's determinations here be affirmed. Thank you, Counsel. Mr. Crow has about a minute and a half of rebuttal time. Thank you, Your Honor. With regard to the copying question that was just asked, there is evidence that we communicated, that Bill Jacob communicated with Apple and that Apple received it. The question of whether they did anything with it, that's evidence that would be solely within Apple's control and because of the limited discovery nature of the Interparties Review as opposed to a digital court litigation, we don't have access to that kind of thing. It would seem incumbent upon Apple if they were to say, no, we designed this separate and apart from you, that they could actually proffer evidence to that effect rather than us fighting against an empty chair where we just don't have access to that kind of information. I understand there was a period of discussion, an extended period of discussion with Apple, correct?  This may not apply to this case, but I'd like to hear your view. To what extent should we consider this period of time where there's consideration of a partnership or a joint venture or the purchase or the licensing of a particular patent? And then finally, the decision. I think it's... And why is that under... Why do we consider that under evidence of copying? I think it's because it's not... Well, circumstantial evidence falls into that category and I think it's not just the extent of time that there were negotiations, but there was this time of negotiation where they were given the information and then at some point they said, no, we don't want it. But then very shortly thereafter, all of a sudden they come out with the accused product and circumstantial evidence is that seems a little fishy. And if they had evidence that, no, we developed it all on our own, they certainly could have provided that in rebuttal to our arguments. I see I'm out of time, but if you'll allow me, I just wanted one further comment about the intermediary question, unless you're good with it. Thank you, counsel. The case is submitted.